UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No.  09-75450

ROGER J. OTTOMAN and                                Chapter 7
MARCIA C. OTTOMAN, by
her POA ROGER J. OTTOMAN,                            Judge Thomas J. Tucker

                        Debtors.
_____/

**OPINION REGARDING DEBTORS' "MOTION TO VOID AND NULLIFY CERTAIN
ALLEGED EXECUTION OF DOCUMENTS AND TRANSFERS OF PROPERTY TO
CREDITOR RL & DG INVESTMENTS AS VIOLATIONS OF THIS COURT'S
AUTOMATIC STAY AND PERMANENT INJUNCTION"**

**I. Introduction**

        The motion now before the Court in this reopened Chapter 7 case presents issues about

the automatic stay, res judicata and collateral estoppel, and the doctrines of waiver and laches.

The motion was filed by the Debtors, and is entitled "Motion To Void and Nullify Certain

Alleged  Execution of Documents and Transfers of  Property to Creditor RL & DG Investments

as Violations of This Court's Automatic Stay and Permanent Injunction" (Docket # 65, the

"Motion").  The  Debtors ask this Court to find that a creditor, RL & DG Investments, LLC ("RL

& DG") violated the automatic stay by purportedly entering into a settlement agreement with the

Debtors and by recording an "Affidavit of Lost Quit Claim Deed" during the pendency of the

Debtors' Chapter 7 bankruptcy case.  The Debtors also allege that RL & DG violated the

automatic stay by filing and prosecuting an eviction case in 2012, also while the bankruptcy case

was pending. The Debtors argue that because of the stay violations, the settlement agreement, the

related alleged transfer of property by quit claim deed to RL & DG, and the recording of the

"Affidavit of Lost Quit Claim Deed" are "void and a nullity."

RL & DG and interested parties, Michael S. Hakala and Danielle Hakala (the"Hakalas") filed responses objecting to the Debtors' Motion.[1]  The Debtors filed a reply brief and the Court held a hearing on the Motion.[2]  After the hearing, the Court entered an order requiring the Debtors and RL & DG to file supplemental briefs on specified legal issues, and giving the Hakalas the option to file a supplemental brief.[3]  All parties filed supplemental briefs.[4]  After reviewing the supplements, the Court held a second hearing, and then issued a second Order regarding further proceedings.  That Order required RL & DG to file certain exhibits (a complete copy of the complaint and attached exhibits filed in the 2012 state court eviction case), and allowed the Debtors to file a response addressing the exhibits.[5]  The exhibits were filed by RL & DG[6] and the Debtors responded.[7]  With leave of the Court, the Hakalas also filed a response, with exhibits attached.[8]

The Court has considered all of the oral and written arguments of the parties, and all of the briefs and exhibits filed by the parties.  For the reasons stated in this Opinion, the Court will deny the Debtors' Motion.

---

[1]  Docket ## 72 and 76.

[2]  Docket ## 81 and 88.

[3]  "Order Regarding Further Proceedings on the Debtors' [Motion]" (Docket # 89).

[4]  Docket ## 91, 92 and 94.

[5]  "Second Order Regarding Further Proceedings on the Debtors' [Motion]" (Docket # 95).

[6]  Docket # 98.

[7]  Docket ## 99-105.

[8]  Docket # 109.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(G), and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11. *See* 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *Allard v. Coenen (In re Trans-Industries, Inc.)*, 419 B.R. 21, 27 (Bankr.E.D.Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," including Bankruptcy Code § 362(a). *Id.* It is a proceeding "arising in" a case under title 11 because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Id.*

## III. Relevant facts and procedural history

The facts stated below are undisputed, except where otherwise indicated.

### A. Events occurring before the Debtors filed this bankruptcy case

#### 1. Events preceding the 2007 Eviction Case

In March 1996, the real property located at 12634 McKinley Heights, Chelsea, Michigan 48118 (the "Property") was conveyed to the Debtors Roger J. Ottoman and Marcia C. Ottoman, through a warranty deed.[9] Later, on March 22, 2001, the Debtors granted a mortgage on the Property to secure a loan, in the amount of $75,000.00, to First Tennessee Bank National

---

[9] Warranty Deed attached as Exhibit A to RL & DG's Response brief (Docket # 76-2).

3

Association ("First Tennessee").[10]  The Debtors defaulted on the mortgage and First Tennessee acquired title to the Property through foreclosure, in July 2003.[11]  There was "protracted litigation over the foreclosure process and other issues, [and] the Debtors were about to be evicted by First Tennessee in late 2006."[12]  The Debtors sought to buy the Property back.  In order to convey the Property back to the Debtors, First Tennessee demanded $165,000.00 and a release from the Debtors, including a dismissal of all litigation and the assignment of a $13,600.00 escrow account.[13]

In an effort to raise the money to buy back the Property, the Debtors sought a mortgage loan from an entity owned by RL & DG.[14]  The loan was not approved, and the Debtors asked Randall Lesson, a principal of RL & DG, to purchase the Property, with the understanding that the Debtors would later buy the Property from RL & DG.[15]  In December 2006, RL & DG purchased the property from First Tennessee, for $165,000.00, and obtained from First Tennessee a quit claim deed to the Property, which was dated December 19, 2006 and recorded on January

---

[10]  Mortgage attached as Exhibit B to RL & DG's Response brief  (Docket # 76-3).

[11]  Sheriff's Deed on Mortgage Sale attached as Exhibit C to RL & DG's Response brief (Docket # 76-4).

[12]  *See* July 30, 2008 District Court Decision, attached as Exhibit 8 to the Motion (Docket # 65-1) at pdf p. 14.

[13]  *Id.*

[14]  *Id.*

[15]  *Id.*

8, 2007.[16]  The Debtors signed the release and dismissal as required by First Tennessee.[17]  The

Debtors and RL & DG entered into a "lease with [an] option," which provided that the Debtors

would retain possession of the Property "on a month to month basis," pay monthly rent of

$2,275.00 to RL & DG, and convey an adjoining vacant parcel to RL & DG.[18]  The Debtors

conveyed that adjoining parcel to RL & DG by a quit claim deed dated December 21, 2006,

which was recorded on January 8, 2007.[19]  As part of the transaction with RL & DG, the Debtors

were given an option to buy the Property from RL & DG for $258,000.00, payable in full within

one year.[20]

### 2. The 2007 Eviction Case

In 2007 RL & DG filed an eviction case (the "2007 Eviction Case") against the Debtors

in Michigan state court. The Debtors were represented in that case by attorney Jan E. Slotnick.[21]

After a trial, the state court ruled that RL & DG was not entitled to possession of the Property.

The state court entered its "Decision" dated July 30, 2008.  Although RL & DG claimed to own

the Property, and to have leased it to the Debtors, the state court did not agree.  Rather, and

---

[16]  *See id.* at pdf pp. 14-15; *see also* Quit Claim Deed dated December 19, 2006, attached as Exhibit D to RL & DG's Response (Docket # 76-5).

[17]  *See* July 30, 2008 District Court Decision attached as Exhibit 8 to the Debtor's Motion (Docket # 65-1) at pdf pp. 14-15.

[18]  *Id.* at pdf p. 15.

[19]  *See* Quit Claim Deed, attached as Exhibit H to Brief by [the Hakalas] (Docket # 92-8).

[20]  July 30, 2008 District Court Decision attached as Exhibit 8 to the Debtor's Motion (Docket # 65-1) at pdf p. 15.

[21]  Both of the Debtors have admitted this.  *See* Motion (Docket # 65) at pdf p. 2 ¶ 7; *see also* text accompanying footnotes 49 and 50, *infra.*; Debtors' brief, filed on February 27, 2019 in the 2018 state court lawsuit that is described in Part III.C.4 of this Opinion, *infra* (Docket # 92-1) at pdf pp. 2-3.

without much explanation, the court "construe[d] the overall transaction" between the Debtors and RL & DG not as a lease, but as an "equitable mortgage."[22]  It does not appear that the state court's Decision or any documentation regarding the existence of an equitable mortgage was ever recorded.

### 3.  The 2009 Circuit Court Case

On May 21, 2009, RL & DG filed a complaint in the Washtenaw County, Michigan Circuit Court (Case No. 09-585-CH), alleging a default by the Debtors under the equitable mortgage, and seeking foreclosure on the Property (the "2009 Circuit Court Case").[23]  On June 24, 2009, in pleadings signed by Jan E. Slotnick, as "Attorney for" the Debtors, the Debtors filed an Answer and a Counter-Complaint, alleging violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et. seq.*, and other statutes.[24]  (As discussed below, the Debtors now deny that attorney Jan Slotnick represented them in the 2009 Circuit Court Case, despite testimony by the Debtor Roger Ottoman, and other evidence, indicating otherwise.)

### B.  Events occurring after the Debtors filed this bankruptcy case on November 18, 2009

While the 2009 Circuit Court Case was still pending, the Debtors filed this Chapter 7 bankruptcy case, on November 18, 2009.  The Debtors were represented by counsel, and Roger Ottoman signed the bankruptcy petition on his own behalf, and also on behalf of Marcia

---

[22]  July 30, 2008 District Court Decision attached as Exhibit 8 to the Debtor's Motion (Docket # 65-1) at pdf p. 15.

[23]  Washtenaw County Circuit Court Complaint, Case No. 09-585CH, attached as Exhibit 6 to the Debtors' Motion (Docket # 65-1) at pdf p 1.

[24]  Washtenaw County Circuit Court Counter-Complaint, Case No. 09-585CH, attached as Exhibit 7 to the Debtors' Motion (Docket # 65-1) at pdf pp. 8-13.

Ottoman, as her agent in fact under a power of attorney.[25] (On the petition date, and during the time period from January 2009 until August 2010, Marcia Ottoman was incarcerated, at "Alderson, a Federal Prison Camp in West Virginia."[26])

### 1. The December 18, 2009 Settlement Agreement

According to RL & DG, the Debtors entered into a written settlement agreement with RL & DG on December 18, 2009 (the "Settlement Agreement").[27] As discussed below, the Debtors deny entering into the Settlement Agreement, despite evidence indicating that they did so. The Court will describe the Settlement Agreement in some detail.

Under the terms of the Settlement Agreement, RL & DG agreed to dismiss its state court foreclosure suit (the 2009 Circuit Court Case), permit the Debtors to occupy the Property, rent-free, until March 1, 2012, and to provide the Debtors with the "unrestricted right to purchase the Property" on or before March 1, 2012, for its "fair market value as of December 14, 2009."[28] In return, the Debtors agreed to dismiss their counter-complaint, and execute a "Deed in Lieu" for the Property in favor of RL & DG with an effective date of March 1, 2012, to be held in escrow

---

[25] Docket # 1 at pdf p. 3 (signed by Marcia C. Ottoman "by her poa Roger J. Ottoman"); *see also* text accompanying footnote 41, *infra*.

[26] Affidavit of Marcia Ottoman dated February 27, 2019 (cited hereinafter at "Marcia Ottoman Aff."), attached as part of Exhibit B to Response to Motion [by the Hakalas] (Docket # 72-2) at pdf pp. 29, 30 ¶ 3; Affidavit of Roger Ottoman, dated February 27, 2019 (cited hereinafter at "Roger Ottoman Aff."), attached as part of Exhibit B to Response to Motion [by the Hakalas] (Docket # 72-2) at pdf pp. 22, 23 ¶ 4.

[27] "Settlement Agreement and Release," copy attached as Exhibit F to RL & DG's Response (Docket # 76-7) (hereinafter cited as the "Settlement Agreement" or the "2009 Settlement Agreement").

[28] Settlement Agreement at 1 ¶ 1.

until that date.[29]

The Settlement Agreement further provided that:

> In the event the Ottomans commence good-faith efforts to obtain a
> loan to purchase the Property on or before March 1, 2012,
> including, but not limited to, submitting a loan application to a
> lender, then RL & DG will allow the Ottomans to complete their
> good-faith efforts to purchase the Property before its files the Deed
> referenced in Provision 2 in the Washtenaw County Register of
> Deeds.[30]

Finally, the Settlement Agreement provided for a division of the proceeds of any sale of

the Property that the Debtors might make before March 1, 2012:

> [I]n the event the Ottomans sell the Property on or before March 1,
> 2012, the excess of the sale price over its fair market value (as of
> December 14, 2009) shall be paid to the Ottomans and the amount
> up to the fair market value as of December 14, 2009, shall be
> remitted to RL & DG[.][31]

Consistent with the Settlement Agreement, a stipulated order dismissing the state court

complaint and counter-complaint in the 2009 Circuit Court Case was later entered, on July 27,

2010. That stipulated order was signed by Jan E. Slotnick, as "Attorney for the Ottomans," who

gave her approval to the order, "as to form and substance."[32]

The Settlement Agreement had terms benefitting both RL & DG and the Debtors. But

none of these parties filed any motion or stipulation seeking an order granting relief from the

---

[29] *Id.* at 1-2 ¶ 2.

[30] *Id.* at 1 ¶ 1.

[31] *Id.* at 2 ¶ 2.

[32] Stipulated Order, attached as part of Exhibit A to the Hakalas' Response (Docket # 72-1) at
pdf pp. 127-129.

8

automatic stay to permit them to enter into the Settlement Agreement, either before or at any time after the December 18, 2009 date of the agreement.  Nor did any party file a motion seeking relief based on a claim that the entry into the Settlement Agreement was a violation of the automatic stay, until the bankruptcy case had been closed for over six years and then reopened in 2019, when the Debtors filed their present Motion.

It appears that as of the December 18, 2009 date of the Settlement Agreement, RL & DG had not been given notice of the Debtors' bankruptcy case (and therefore had not been given notice that the automatic stay had arisen).  Neither RL & DG nor any of its attorneys were listed in the Debtors' creditor mailing matrix filed with the bankruptcy petition on November 18, 2009.[33]  Nor were any of them listed in the Debtor's amended creditor mailing matrix, filed November 20, 2009.[34]  Similarly, RL & DG was not listed as a creditor in the Debtors' Schedules filed with the petition, or in the Debtors' amended Schedules filed November 20, 2009.[35]  As a result, the notice of commencement of this case, mailed by the Bankruptcy Noticing Center to creditors on November 21, 2009, was not mailed to RL & DG or any of its attorneys.[36]  RL & DG's did know about this bankruptcy case by January 5, 2010; its attorney filed a Notice of Appearance in the case on that date.[37]

The Debtors listed the Property address ("12634 McKinley Heights Chelsea, MI") as their

---

[33]  Docket # 1 at pdf pp. 38-40.

[34]  Docket # 10 at pdf pp. 10-14.

[35]  Docket ## 1 at pdf pp. 12-18; Docket # 10 at pdf pp. 1-9.

[36]  *See* Docket # 11 at pdf p. 3.

[37]  Notice of Appearance (Docket # 22).

9

address on their bankruptcy petition, but they did not list any ownership interest in the Property, or in any other real property, in their Schedule A.[38]  In their Statement of Financial Affairs, filed on the petition date, the Debtors stated that there was a pending lawsuit entitled "Roger J. Ottoman and Marcia C. Ottoman v. real property owner."[39]

## 2. Roger Ottoman's § 341 Meeting testimony, on behalf of both of the Debtors, about the Settlement Agreement

The Debtor Roger Ottoman testified at the § 341 Meeting of Creditors held on December 23, 2009.  The Debtor Marcia Ottoman did not appear at that meeting of creditors.  On January 4, 2010, her attorney filed a motion to excuse her attendance at the § 341 Meeting.[40]  The motion stated that Marcia Ottoman was incarcerated and could not attend, but that the Debtor Roger Ottoman "has a power of attorney for" Marcia Ottoman, and "has the ability to testify at the 341 on behalf of both Debtors as he has knowledge of their financial situation."[41]  After no one timely objected to this motion, the Court entered an Order granting it, on January 25, 2010.[42]  Thus, the Debtor Roger Ottoman must be viewed as having testified at the § 341 meeting on his own

---

[38]  Docket # 1 at pdf p. 6 (Schedule A).  The instructions for Schedule A state, in part: "list all real property in which the debtor has any legal, equitable, or future interest..."  *Id.*  It was not until May 10, 2019 that the Debtors filed an amended Schedule A/B, for the first time listing the Property as a property in which they had a legal or equitable interest.  Amended Schedule A/B (Docket # 82 at pdf p. 3).  In that amended Schedule A/B, the Debtors described their interest in the Property only as a "[p]ossessory interest subject to equitable mortgage."  *Id.*

[39]  Statement of Financial Affairs (Docket #1 at pdf p. 26).  The Debtors filed an amended Statement of Financial Affairs on December 30, 2009 (Docket # 16), but it did not amend the listing of this civil action.

[40]  Docket # 21.

[41]  *Id.* at ¶¶ 2-5.

[42]  Docket # 29.

10

behalf and on behalf of the Debtor Marcia Ottoman.

This matters because Roger Ottoman testified about the Debtors' settlement with RL & DG. And that testimony contradicts several of the current assertions by the Debtors about the Settlement Agreement. Currently, the Debtors both swear, in affidavits dated March 4, 2019, that: (1) neither of them employed or authorized attorney Jan Slotnick to represent them in the 2009 Circuit Court Case; (2) neither of them signed or agreed to the Settlement Agreement; and (3) neither of them signed a quit claim deed to the Property dated July 1, 2010.[43] This is similar to the Debtors' sworn statements in their affidavits dated February 27, 2019.[44]

But Roger Ottoman testified quite differently under oath at the § 341 meeting on December 23, 2009. To the extent that § 341 testimony contradicts the much later affidavits of the Debtors, the § 341 testimony governs. It is well-settled that a party's affidavit which contradicts his/her own prior sworn testimony cannot be used to establish a question of fact. *See Reid v. Sears Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006).

In his § 341 meeting, Roger Ottoman first was questioned about the power of attorney that permitted him to act on behalf of his wife, Marcia, and he testified that it was prepared by attorney Jan Slotnick.[45] When asked how he knew Jan Slotnick, Ottoman testified: "A. She's the attorney for our – the house foreclosure that we have been working on. Q. Presently you mean?

_____

[43]  Affidavit of Marcia Ottoman, dated March 4, 2019 (Docket # 65 at pdf p. 13); Affidavit of Roger Ottoman (Docket # 65 at pdf p. 12).

[44]  *See* the affidavits cited in footnote 26 of this Opinion.

[45]  § 341 Hearing Transcript, copy attached as Exhibit G to RL & DG's Response (Docket # 76-8) (hereinafter cited as the "§ 341 Hearing Transcript") at pdf p. 8.

11

A. Well, it's just been settled. Yes."[46]

Later in the § 341 meeting, Roger Ottoman was asked about the foreclosure:

Q. Mr. Ottoman, what – where is your personal residence?

A. Chelsea, Michigan

Q. What's the address?

A. 12634 McKinley Heights.

Q. And how long have you been at that residence?

A. About 10 years.

Q. Is that the property that is the subject of the foreclosure?

A. Yes.

Q. And you indicated the foreclosure has recently been settled.
How was that settled?

A. We have the ability to live in the house for another two years.

Q. Do you have to make a monthly payment to live in that house?

A. No.[47]

Roger Ottoman further testified that the mortgage on the property was held by "D & G

Investments."[48]

This § 341 testimony by Roger Ottoman is consistent with the terms of the Settlement

Agreement, dated December 18, 2009, and the testimony corroborates RL & DG's position that

---

[46] *Id.*

[47] *Id.* at 9-10.

[48] *Id.* at 10.

the parties did enter into the Settlement Agreement at that time. This testimony by Roger

Ottoman also shows that attorney Jan Slotnick in fact was representing the Debtors in the 2009

Circuit Court Case, and in connection with the Settlement Agreement.

### 3. The Debtors' 2018 admissions about the Settlement Agreement

There is additional evidence corroborating RL & DG's position on these matters, and

contradicting the Debtors' current position. In 2018, the Debtors filed a lawsuit in the

Washtenaw County, Michigan Circuit Court against RL & DG and others, which is discussed in

more detail below. In that lawsuit, the Debtors are represented by attorney Ronald L. Broquet.

In their amended complaint dated October 16, 2018, the Debtors stated (and thereby admitted)

that: (1) attorney Jan E. Slotnick represented the Debtors, not only in the 2007 Eviction Case, but

also in the 2009 Circuit Court Case; (2) the Debtors reached a settlement with RL & DG, with

terms consistent with those in the written Settlement Agreement, described above. The Debtors'

amended complaint alleged:

> 11. . . . [RL & DG] through some underhanded dealing wound up
> with ownership of [the Property]. Litigation ensued in the 14A
> District Court in Chelsea, Michigan before Judge Richard Conlin.
> After a trial, Judge Conlin rendered a written decision wherein he
> stated his finding of facts providing a more detailed background of
> the facts of what occurred between [RL & DG] and [the Debtors].
> He determined that the interest held by [RL & DG] in the
> [Property] was not ownership, but that of an "equitable mortgage."
> See Exhibit A attached.
>
> 12. **[The Debtors] were represented by [Jan E. Slotnick], in the
> proceedings before Judge Conlin as well as the matter brought
> by [RL & DG] in the Washtenaw Circuit Court.**
>
> 13. Not satisfied with Judge Conlin's decision, [RL & DG] then
> appealed to the Washtenaw Circuit Court. **At some point a
> settlement was reached which granted [the Debtors] the right**

13

**to occupy the [Property] with the requirement that they had
two years in which to pay [RL & DG] the fair market of the
[Property] as of December 14, 2009.**

14. [The Debtors] were never provided any settlement paperwork
by **attorney JAN SLOTNICK**, but **told them that they had until
March 1, 2012 to pay [RL & DG] the value of the subject due
under the settlement.**[49]

In their original complaint, filed in this state court action on August 24, 2018, the Debtors made

these same admissions.[50]

### 4. The Chapter 7 Trustee's April 30, 2010 motion to approve compromise with the Debtors, which was joined by the Debtors, and which was premised on the 2009 Settlement Agreement

There is additional evidence showing that the Debtors knew about, and had agreed to, the

Settlement Agreement. On April 30, 2010 the Chapter 7 Trustee filed a motion to approve a

compromise.[51] The motion was signed by counsel for the Trustee, and it also was signed by the

Debtors' bankruptcy attorney, Michelle L. Marrs, as "[a]pproved for filing."[52] The motion stated

that the Trustee "learned that [the] Debtors brought a counter-claim against their home mortgage

lender that resulted in a settlement whereby the Debtors gained twenty-six (26) months of rent-

free usage of their home, valued at approximately $26,000.00 ('the Claim')."[53] The motion

---

[49] "Amended Complaint for Fraud and Conspiracy," copy attached as part of Exhibit A to Response to Motion [by the Hakalas] (Docket # 72-1) at pdf pp. 73-74 (emphasis added).

[50] *See* "Complaint for Fraud and Conspiracy," copy attached as Exhibit P to Supplemental Response filed by the Hakalas (Docket # 92-16) at pdf pp. 5-6.

[51] "Trustee's Application for Order Approving Compromise" (Docket # 37).

[52] *Id.* at 3. Michelle Marrs and the law firm Marrs & Terry, PLLC were the attorneys of record for the Debtors in this bankruptcy case, from the petition date until at least August 30, 2012, when the Court granted leave for them to withdraw. *See* Order [etc.], filed August 30, 2012 (Docket # 52).

[53] *Id.* at 1 ¶ 5.

14

further stated that the Trustee "proposed to settle the non-exempt portion of the Claim for $12,500.00 payable by the Debtors in twenty-six (26) installments of $480.76 per month."[54] There were no objections to the Trustee's motion, and the Court entered an Order approving the compromise on May 25, 2010.[55] The Order provided that in the event of a default on the payments by the Debtors, the Trustee could file a notice of default and the Debtors' discharge "shall, thereafter, be revoked unless the default is cured within 14 days after the notice of default is filed."[56]

No notice of default was ever filed, and the Trustee's Final Account states that the estate received the $12,500.00.[57]

From the Trustee's April 30, 2010 motion to approve compromise, which was also signed by the Debtors' bankruptcy attorney, the May 25, 2010 Order granting that motion, and the Debtors having actually made the $12,500.00 in payments to the Trustee, it is clear that the Debtors knew about, and had agreed to, the settlement with RL & DG, which had allowed them to stay, rent free, in the Property for 26 months. This is further strong evidence that the Debtors knew of and had agreed to the Settlement Agreement.

### 5. The closing and reopening of the bankruptcy case

This bankruptcy case was closed on January 15, 2013, and it remained closed for more than six years, until the case was reopened on February 26, 2019, on motion of the Debtors. The

---

[54]  *Id.* at 1 ¶ 6.

[55]  Order Approving Compromise (Docket # 40).

[56]  *Id.*

[57]  Trustee's Final Account (Docket # 57 at pdf pp. 1, 3).

15

Chapter 7 Trustee did not attempt to administer the Property in any way for the benefit of the bankruptcy estate, other than to collect the $12,500.00 in settlement payments from the Debtors.

**C. Events that occurred in 2012, while this bankruptcy case was still open**

**1. RL & DG's recording of the "Affidavit of Lost Quit Claim Deed"**

As noted above, under the terms of the 2009 Settlement Agreement, March 1, 2012 was the deadline for the Debtors to purchase the Property from RL & DG, and also the end of the Debtors' right to remain in the Property, rent-free. It is undisputed that the Debtors did not purchase the Property from RL & DG by the March 1, 2012 deadline. Soon thereafter, on April 4, 2012, RL & DG filed an "Affidavit of Lost Quit Claim Deed" with the Washtenaw County, Michigan Register of Deeds.[58] The affidavit states that RL & DG received a quit claim deed for the Property on or about July 1, 2010 (the "Quit Claim Deed"). The affidavit also states that the original deed could not be located, and that a copy of the Quit Claim Deed was attached. That copy of the Quit Claim Deed has signatures purporting to be those of Marcia Ottoman and Roger Ottoman, dated July 1, 2010, and the Debtors' signature acknowledgment purportedly was notarized by Jan E. Slotnick, who was the attorney who signed the answer and counter-complaint on behalf of Debtors in the 2009 Circuit Court Case.[59]

**2. RL & DG's filing and prosecution of the 2012 Eviction Case**

In June 2012, while this bankruptcy case was still pending, RL & DG filed an eviction case against the Debtors in state court (the "2012 Eviction Case"). RL & DG filed its

---

[58] Affidavit of Lost Deed attached as Exhibit J to RL & DG's response (Docket # 76-11).

[59] *Id.* As will be discussed further, the Debtors allege that, in fact, they did not sign the Quit Claim Deed and that the signatures are forgeries.

16

"Complaint to Recover Possession of Property" in the 14A-3 District Court of Michigan. The Complaint alleged that RL & DG had the right to possession of the Property, because "[RL & DG] owns the Property pursuant to quit claim deed executed by [the Debtors]."[60]

The Debtors retained an attorney, Eric Ladasz, to represent them in the 2012 Eviction Case. He filed an answer to the eviction complaint on or about June 22, 2012, alleging that the Debtors, not RL & DG, were entitled to possession of the Property and further alleging that "the purported Quit Claim Deed was a product of fraud."[61] The answer also referred specifically to the "Settlement Agreement dated December 18, 2009."[62] (This, of course, shows that the Debtors' attorney, Eric Ladasz, knew of the written Settlement Agreement when he filed the answer in the 2012 Eviction Case.)

On June 28, 2012 the state court held a hearing on the eviction complaint. Both of the Debtors were present during the hearing, with their attorney Eric Ladasz.[63] The Debtors have

---

[60] Complaint 14A-3 District Court Case No. 12-1157 attached as Exhibit A to RL & DG's Supplemental Brief (Docket # 98 at pdf p. 4). Debtor Marcia Ottoman alleges that the complaint that appears at Docket # 98 p 4 "differs significantly" from the copy of the complaint she received when she obtained copies of the court file in 2014. (Marcia Ottoman Affidavit (Docket #100) at ¶ 8). Aside from noting the copy she received in 2014 had a different date stamp and a different fax page number, Marcia Ottoman does not state that the substance of the allegations in the complaints differ. Moreover, a review of the complaint allegedly obtained by the Debtors in 2014 shows that it states the same allegation, that "[RL & DG] owns the Property pursuant to quit claim deed executed by [Debtors]." (*See* Exhibit C to Marcia Ottoman Affidavit (Docket # 104) at pdf p. 4).

[61] Answer in 14A-4 District Court Case No. 12-1157, attached as Exhibit M to RL & DG's Response (Docket # 76-14) at ¶ 5.

[62] *Id.*

[63] Transcript of June 28, 2012 Hearing (Docket # 102) at 12-13; *see also* Affidavit of Marcia C. Ottoman (Docket # 100) at ¶ 3.

17

filed a transcript of this hearing.[64]  A review of this transcript is important in this case, because it conclusively shows that at least as early as June 28, 2012:

- the Debtors both knew of the 2009 Settlement Agreement;

- the Debtors' attorney, Eric Ladasz, had a copy of the 2009 Settlement Agreement;

- the Debtors both knew all of the terms of the 2009 Settlement Agreement (the terms were described clearly and in detail, and discussed, in the Debtors' presence, during the hearing);

- the Debtors knew about the Affidavit of Lost Quit Claim Deed and that RL & DG had recorded it on April 4, 2012, and the Debtors knew about the copy of the Quit Claim Deed attached to that Affidavit;

- the Debtors' attorney, Eric Ladasz, had a copy of the Affidavit of Lost Quit Claim Deed and its attached copy of the Quit Claim Deed; and

- the Debtors' attorney and the Debtors knew that RL & DG was claiming that the Debtors had both signed the Quit Claim Deed.

All of these things are clear from the following statements in the transcript, all of which were made while both of the Debtors and their attorney Eric Ladasz were in the courtroom listening.  And as is clear from the following transcript excerpts, during the hearing, the Debtors' attorney, Eric Ladasz, even made a defensive argument that was based on the "good faith efforts" provision of the 2009 Settlement Agreement (which is described in Part III.B.1 of this Opinion, above):

> MR. HERON: Good morning, Your Honor.  Matthew Heron appearing on behalf of Plaintiff, RL and DG Investments, LLC.
>
> MR. LADASZ: Good morning, Your Honor.  May it please the Court, Eric Ladasz on behalf of the Defendants, Roger and

---

[64] *Id.* at ¶ 11.  The transcript appears at Docket # 102 in this case, at pdf pp. 10-53.  It is cited hereinafter as "June 28, 2012 Tr. at __".

Marcia Ottoman, who are present to my left.

THE COURT: All right. What's the claim in this case?

MR HERON: Your Honor, . . . our client has a Quit Claim Deed to the property, which was signed by both of the Ottoman[s], under which our client claims possession -- And it would be the rightful possession of the property.

As a background -- Just a little bit of a background -- the Defendants in this case . . . are the prior owners of the property and have lived in it, as least, since before 2006.

In December 2006, our client agreed to lease the property to them on certain terms. The relationship did not work out. . . . A Court construed that as an equitable mortgage, which our clients foreclosed.

The long and short of it is that our clients -- Our respective clients agreed to a Settlement Agreement in December of 2009. That is the agreement under which the Defendants primary defense is based.

Under that Settlement Agreement, the parties released all claims against each other, except as to those terms of -- in the Settlement Agreement, which under the Settlement Agreement, . . . the Ottoman[s] executed Quit Claim Deeds as to the property at issue in this case.

Under that Settlement Agreement, the Ottoman[s] also had until March 1st, 2012 to purchase the property from RL and DG Investments, LLC, pursuant to a price determined under the market conditions as of December 2009.

That event did not occur. The Ottoman[s] did not buy the property. As a result, the Quit Claim Deeds (sic) which had been held in escrow were recorded and our client is able to obtain possession pursuant to the terms of the Settlement Agreement and pursuant to the Quit Claim Deeds (sic).

. . . There are not questions as to those issues. There was no purchase of the property by the Ottoman[s]. The Quit Claim Deeds' bear their rightful signatures -- They are attached to our

19

complaint . . ..

MR. LADASZ: Your Honor, in my Answer, I had raised a couple of defenses. The first and main one is that the Settlement Agreement and Release does have a clause in there that states in the event the Ottomans commence good faith efforts to obtain a loan to purchase the property on or before March 1st, 2012, including but not limited to submitting a loan application to a lender that RL and DG will allow the Ottoman[s] to complete their good faith efforts to purchase the property before it files the Deed referenced in Provision Two.

Now that purchase price, which would be the paragraph above states that it's the market value as of December 14, 2009. It's not a sum certain.

My clients made diligent attempts, including sending certified letters to RL and DG's registered agent, all of them to be either refused or returned, which I have copies of.

My clients did apply for loans through the World Development, which is a government subsidized -- since we are dealing with acreage -- And the response to my clients was that, well, we need a Purchase Agreement.

My clients attempted to contact RL and DG -- to be completely unsuccessful . . ..

. . .

Therefore, by that provision, alone, this case should be dismissed, because it is premature, because my clients are allowed to continue -- if they had made a good faith effort to obtain a loan -- You can't get a loan to purchase a property without a purchase price or a Purchase Agreement. My clients made attempts and all to be flat out ignored by the Defendants (sic).

Number two: I have raised the issue of fraud regarding the Settlement Agreement, the Quit Claim Deed, and everything else regarding this transaction.

Although, Mr. Heron did recite a brief history of this, but this whole transaction stem[s] from my client walking into RL and DG Investments Mortgage Company to obtain a mortgage, only to

20

come out of that place, signing the Deed away to the place and not even realizing it, which is how this whole sequence of events have snowballed to where we're at today, Your Honor.

I still challenge the Settlement Agreement and Release, as this is a component of fraud that I would ask the Court for an opportunity to submit Briefs on the issue, along with -- If we need an Evidentiary Hearing -- based on my clients' good faith efforts -- if this Court was to accept the Settlement Agreement as an enforceable order.

. . .

THE COURT: Well, why do I have an Affidavit of Lost Quit Claim Deed?

MR. HERON: In order to record a Quit Claim Deed, you need to have an original. And we -- what you have is a copy of the documents that were recorded with the Register of Deeds, and the Affidavit of Lost Quit Claim Deed is an original document, which includes behind it, the copies of the documents that were signed by the Ottoman[s].

. . .

THE COURT: Well, I understand that it's a requirement, counsel. I guess -- Where is the original deed?

. . .

MR. HERON: . . . My understanding is that . . . The purpose behind the Affidavit, itself, was that the original Quit Claim Deed could not be located. And notwithstanding that, it was executed -- The signatures on that Deed are not . . . challenged -- At least, to my understanding -- they're not being challenged by the Ottoman[s].

. . .

THE COURT: . . . [W]hat does the Settlement Agreement say with reference to the Deed?

MR HERON: That they would be held by the Plaintiff, RL and DG and that if the property was not sold, we would . . . record them; which we did, after March 1st--

THE COURT: What would be . . . recorded?

21

MR. HERON: The Quit Claim Deeds signed by the Ottoman[s].

. . .

MR. HERON: . . . Under the premise of the Settlement Agreement, we were given a Quit Claim Deed that provided that we could enforce it.

. . .

THE COURT: . . . Where is the Settlement Agreement?

. . .

MR. LADASZ: We have copies of it, Your Honor.

. . .

MR. LADASZ: I have a larger copy.

. . .

THE COURT: When were the Deeds filed?

MR. HERON: The Deeds were recorded --

MR. LADASZ: April 4th, 2012, Your Honor.[65]

At no time during the June 28, 2012 hearing, or at any other time during the 2012 Eviction Case, did the Debtors allege that they had not signed and agreed to the 2009 Settlement Agreement, or that they had not signed the Quit Claim Deed.[66]

As is clear from the June 28, 2012 hearing transcript quoted above, no later than June 28, 2012, both of the Debtors, and their attorney Eric Ladasz, knew *all* of the facts on which the Debtors now base their claim that RL & DG violated the automatic stay. But at the June 28, 2012 hearing, and during the entire pendency of the 2012 Eviction Case, the Debtors never made

---

[65] June 28, 2012 Tr. at pdf pp. 12-19, 23-24

[66] Marcia Ottoman spoke up at numerous other times during the June 28, 2012 hearing, about other facts and issues. *See id.* at pdf pp. 43-46, 51.

any argument that RL & DG violated the automatic stay in any way, including by making the

Settlement Agreement, or obtaining the Quit Claim Deed, or recording the Affidavit of Lost Quit

Claim Deed, or filing and prosecuting the 2012 Eviction Case.

During the June 28, 2012 hearing, the state court decided that further proceedings should

be held, including a period of time for discovery, due at least in part to the Debtors' "good faith

efforts" defense.

After holding a further hearing on September 24, 2012, attended by both of the Debtors,[67]

the state court determined that there was no triable issue, under Mich.Ct.R. 4.201(J)(2),[68] and that

RL & DG was entitled to possession of the Property. This decision appears to have been based,

at least in part, on the fact that the Debtors had failed to obey an order of the court to respond to

discovery requests by a date certain.[69] In any event, the state court entered a judgment on

October 9, 2012, entitled "Order Granting Judgment of Possession" in favor of RL & DG (the

"2012 Eviction Judgment").[70]

The Debtors never appealed the 2012 Eviction Judgment. They were evicted from the

---

[67] The Debtors' attorney, Eric Ladasz, did not attend the September 24, 2012 hearing. He had moved for and been granted leave to withdraw as counsel for the Debtors, in an order dated September 14, 2012. *See* Exhibit B to the Hakalas' Response (Docket # 72-2) at pdf p. 36.

[68] Mich.Ct.R. 4.201(J)(2), governing trial of "Summary Proceedings to Recover Possession of Premises" states: "At trial, the court must first decide pretrial motions and determine if there is a triable issue. If there is no triable issue, the court must enter judgment."

[69] There is only a partial transcript of the September 24, 2012 hearing in the record. It appears as part of Exhibit B to the Hakalas' Response (Docket # 72-2) at pdf pp. 38-47. Pertinent pages of this transcript include pdf pp. 40, 43-45.

[70] Order and Judgment entered October 9, 2012 in 14-A4 District Court Case No. 12-1157, copy attached as Exhibit N to the Hakalas' Supplemental Brief (Docket # 92-14).

Property, on October 16, 2012.[71]

### 3. RL & DG's sale of the Property to the Hakalas

On May 10, 2013, RL & DG sold the Property to the Hakalas, with a warranty deed that was recorded on July 25, 2013.[72]

### 4. The Debtors' 2018 lawsuit

More than five years later, on August 24, 2018, the Debtors filed an action in Washtenaw County, Michigan Circuit Court against several defendants, including RL & DG, the Hakalas, and Jan Slotnick, the attorney who represented them in the 2007 Eviction Case and in the 2009 Circuit Court Case.[73] For the first time, the Debtors alleged that RL & DG forged the Debtors' signatures on the quit claim deed attached to the Affidavit of Lost Deed filed in April 2012.[74] The Debtors also alleged that RL & DG, the Hakalas and Jan Slotnick conspired and participated in a scheme to deprive the Debtors of the Property.[75] The Hakalas filed a counter-claim seeking to quiet title.[76]

---

[71] Affidavit of Marcia Ottoman dated February 27, 2019 (cited hereinafter at "Marcia Ottoman Aff."), attached as part of Exhibit B to Response to Motion [by the Hakalas] (Docket # 72-2) at pdf p. 32 ¶ 22; Affidavit of Roger Ottoman, dated February 27, 2019 (cited hereinafter at "Roger Ottoman Aff."), attached as part of Exhibit B to Response to Motion [by the Hakalas] (Docket # 72-2) at pdf p. 25 ¶ 22.

[72] Warranty Deed attached as Exhibit O to RL & DG's response (Docket # 76-16).

[73] "Complaint for Fraud and Conspiracy," copy attached as Exhibit P to Supplemental Response filed by the Hakalas (Docket # 92-16); "Amended Complaint for Fraud and Civil Conspiracy," copy attached as part of Exhibit A to the Hakalas' response brief (Docket # 72-1).

[74] *Id.* at ¶¶ 30-37.

[75] *Id.* at ¶¶ 39 40.

[76] Counter-claim, attached as Exhibit A to the Hakalas' response brief (Docket # 72-1) at pdf pp. 63-69.

In their complaint and their amended complaint, the Debtors did not allege that RL & DG had violated the automatic stay in any way.

In January 2019, the Hakalas and RL & DG filed motions for summary disposition.[77] The Debtors filed a response to the motions.[78]

### 5. The Debtors' filing of the present Motion, after obtaining new bankruptcy counsel

On February 25, 2019, with new bankruptcy counsel, the Debtors filed an ex parte motion in this Court to reopen their Chapter 7 bankruptcy case, in order to file the present Motion.[79] This Court entered an Order reopening the Chapter 7 case on February 26, 2019. The 2018 Circuit Court Case then was stayed by the state court, pending the disposition of the Debtors' Motion in this Court.[80]

## IV. The Debtors' present Motion

In their Motion, the Debtors now deny that they signed either the December 18, 2009 Settlement Agreement or the quit claim deed dated July 1, 2010. They also allege that RL & DG violated the automatic stay by entering into the Settlement Agreement, filing the Affidavit of Lost Quit Claim Deed, and bringing the 2012 Eviction Case, all during the pendency of this bankruptcy case. Citing *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905 (6th Cir. 1993), the

---

[77] Motion for Summary Disposition, attached as Exhibit A to the Hakalas' response brief (Docket # 72-1).

[78] Answer to Motion for Summary Disposition, attached as Exhibit B to the Hakalas' response brief (Docket # 72-2).

[79] Ex Parte Motion to Reopen Chapter 7 Case (Docket # 61).

[80] Order Reopening Chapter 7 Case (Docket # 62); Order Staying Case, attached as Exhibit D to the Hakalas' response brief (Docket # 72-4).

Debtors argue that because of the stay violations, the Settlement Agreement; the alleged transfer by quit claim deed of the Property to RL & DG; and the recording of the Affidavit of Lost Quit Claim Deed are void.[81]  The Debtors also argue that the enforcement of the 2009 Settlement Agreement is a violation of the discharge injunction under 11 U.S.C. § 524(a)(2).[82]

RL & DG argues that the Debtors are barred from now claiming a violation of the automatic stay, because they did not raise the issue in the 2012 Eviction Case.[83]  RL & DG also argues that the Debtors are barred by the doctrines of laches, waiver, and judicial estoppel from claiming the alleged violations of the automatic stay.[84]

The Hakalas support RL & DG's arguments, and also argue that the Motion must be denied because they are bona fide purchasers of the Property.[85]

Both RL & DG and the Hakalas claim that, under *Easley v. Pettibone*, equitable circumstances exist to prevent Debtors from alleging a violation of the automatic stay.[86]

## V.  Discussion

### A.  The Debtors waived the right to allege violations of the automatic stay.

RL & DG argues that the Debtors waived the right to seek any relief for any violations of the automatic stay.  A debtor "by his actions or lack thereof" can waive the right to complain

---

[81]  Motion (Docket # 65) at pdf p. 3.

[82]  *Id.*

[83]  RL & DG Supplemental Brief (Docket # 91) at pdf p. 3.

[84]  *Id.* at pdf pp. 5-8.

[85]  Hakala Response (Docket # 72).

[86]  RL & DG Supplemental Brief (Docket # 91) at pdf p. 12; Hakalas' Supplemental Brief (Docket # 92).

about alleged violations of the automatic stay. *America Online, Inc. v. Uhrig (In re Uhrig)*, 306

B.R. 687, 694 (Bankr.M.D.Fla. 2004). Waiver occurs when that debtor "appears and defends a

suit on any basis other than the application of the automatic stay." *Id.*, quoting *In re Cobb*, 88

B.R. 119, 121 (Bankr.W.D.Tex. 1988). In *Cobb*, the bankruptcy court, although noting that a

debtor cannot waive the automatic stay, rejected the debtor's argument that a motion in a state

court case was filed in violation of the bankruptcy stay, because the debtor appeared through

counsel and contested the motion on the merits. *In re Cobb*, 88 B.R. at 120-21.

     In this case, the Debtors allege that RL & DG violated the automatic stay, by purportedly

making the December 18, 2009 Settlement Agreement, by filing the Affidavit of Lost Quit Claim

Deed in April 2012, and by filing and prosecuting the 2012 Eviction Case, all while the

bankruptcy case was pending. However, the Debtors did not raise their pending bankruptcy case

or the automatic stay at any time in the 2012 Eviction Case — not in their filed answer to the

eviction complaint, not at the June 28, 2012 hearing in the state court, and not at any other time.

In its complaint filed in the 2012 Eviction Case, and during the June 28, 2012 hearing, RL & DG

expressly relied on the 2009 Settlement Agreement and the Affidavit of Lost Quit Claim Deed to

support its claim to ownership of the Property, and its resulting right to possession.

     The Debtors could have defended the 2012 Eviction Case by arguing the alleged

violations of the automatic stay as a defense. But they did not do so, and that case went to a final

judgment in favor of RL & DG. The Debtors also could have sought relief in this Court for the

alleged stay violations, at any time before the 2012 Eviction Case went to a final judgment on

October 9, 2012. But they did not do that either. And as discussed in Part III.C.2 of this

Opinion, the record is very clear that both of the Debtors and their eviction attorney, Eric Ladasz,

knew in detail, at least as early as June 28, 2012 (and probably much earlier), ***all*** of the facts

upon which the Debtors now base their claim that RL & DG violated the automatic stay. And the

record is very clear that no later than June 28, 2012 (and probably much earlier), the Debtors'

eviction attorney, Eric Ladasz, actually had a copy of the 2009 Settlement Agreement and the

April 4, 2012 Affidavit of Lost Quit Claim Deed and its attachments. *See* discussion in Part

III.C.2 of this Opinion. And all of attorney Ladasz's knowledge is imputed to the Debtors,

consistent with "the traditional principle that a party is 'considered to have notice of all facts,

notice of which can be charged upon the attorney.'" *Cruz-Gomez v. Lynch*, 801 F.3d 695,700 (6th

Cir. 2015) quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 634 (1962).

Under these circumstances, the Debtors' failure to raise the automatic stay or the alleged

violations of the automatic stay while the 2012 Eviction Case was pending constitutes a waiver

of any argument by the Debtors that the 2009 Settlement Agreement, the April 4, 2012 filing of

the Affidavit of Lost Quit Claim Deed, or the filing and prosecution of the 2012 Eviction Case,

were violations of the automatic stay.[87]

And with respect to the December 18, 2009 Settlement Agreement, there is an additional

reason why the Debtors have waived their claim that RL & DG violated the automatic stay in

making that Agreement. If that Agreement was actually made by the parties (*i.e.*, by RL & DG

and the Debtors), as the evidence described in Parts III.B.2, III.B.3, and III.B.4 of this Opinion

strongly suggests, then the Debtors participated in any violation of the automatic stay that

---

[87] The Debtors, in their briefs and at oral argument on the Motion, have alleged that they were ill-served by the various attorneys who have represented them in the state court cases and this bankruptcy case. However, it is well-settled that a client is bound by the acts of his attorney and cannot "avoid the consequences of the acts or omission of [a] freely selected agent." *Haffey v. Crocker (In re Haffey)*, 576 B.R. 540, 550 (6th Cir. BAP 2017) quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-634 (1962).

occurred by the entry into the Settlement Agreement. [88] And the Debtors benefitted from the Settlement Agreement, in retaining possession of the Property rent-free for 26 months (while only having to pay the Chapter 7 Trustee 48% ($12,500.00), over time, of the $26,000.00 value of such rent-free possession). And the Debtors also benefitted from other provisions of the Settlement Agreement, including the provision that allowed the Property to be sold any time before March 1, 2012, with the Debtors retaining all proceeds of such sale that exceeded the fair market value of the Property as of December 14, 2009. *See* discussion in Parts III.B.1 and III.B.4 of this Opinion. Such participation by the Debtors, in conduct that they now claim violated the automatic stay, itself creates a waiver by the Debtors of any argument that the making of the Settlement Agreement was an automatic stay violation. This is particularly so in this case, because the Debtors were represented by counsel in their bankruptcy case at the time of such conduct.

**B. The ownership of the Property was conclusively determined by the final judgment in the 2012 Eviction Case, and cannot be relitigated now.**

RL & DG argues that Debtors are precluded, under the doctrine of res judicata, from alleging the automatic stay violations, based on the final judgment entered in favor of RL & DG in the 2012 Eviction Case. The Court concludes that, based on the final judgment entered in the 2012 Eviction Case, the doctrines of res judicata and collateral estoppel both bar the Debtors, not only from alleging the automatic stay violations, but also from contesting that RL & DG owned the Property (until RL & DG later sold the Property to the Hakalas in May 2013).

In federal court, the preclusive effect of a prior state-court judgment is determined by the

---

[88] The Debtors were also subject to the automatic stay. *See* 11 U.S.C. § 362(a) (automatic stay is "applicable to all entities").

law of the state.  *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015).

> State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state.  In other words, '[i]f an individual is precluded from litigating a suit in state court by the traditional principles of res judicata, he is similarly precluded from litigating the suit in federal court.'  We look to the state's law to assess the preclusive effect it would attach to that judgment.

*Id.* (internal quotation marks and citations omitted).

Under Michigan law, when the doctrine of res judicata applies, it "bars a subsequent action between the same parties."  *Sewell v. Clean Cut Mgmt., Inc.,* 621 N.W.2d 222, 225 (Mich. 2001).  Under Michigan law, res judicata applies where: "(1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies."  *Id.* (citation omitted).  "Michigan courts have broadly applied the doctrine of res judicata.  They have barred, not only claims already litigated, but every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not."  *Id.* (citation omitted).

Under Michigan law, an eviction action is a "summary proceeding," for which there is a statutory exception to the normal, broad application of res judicata.  Mich. Comp. Laws § 600.5750, states, in pertinent part:

> The remedy provided by summary proceedings is in addition to, and not exclusive of, other remedies, either legal, equitable or statutory.  A judgment for possession under this chapter does not merge or bar any other claim for relief . . . .

The Michigan Supreme Court has interpreted this statute to prevent res judicata from barring claims that could have been, but were not, brought in a summary proceeding.  *Sewell v. Clean*

*Cut. Mgmt., Inc.,* 621 N.W.2d at 225, citing *J.A.M. Corp. v. AARO Disposal, Inc.,* 600 N.W.2d

617, 621-622 (Mich. 1999). But the Michigan Supreme Court has made clear that where a claim

was actually litigated in the summary proceeding, res judicata applies to preclude relitigation of

that claim. *See Sewell v. Clean Cut. Mgmt., Inc.,* 621 N.W.2d at 225.

Collateral estoppel, sometimes referred to as "issue preclusion" applies as well. Under

Michigan law:

> [c]ollateral estoppel bars relitigation of an issue in a new action
> arising between the same parties or their privies when the earlier
> proceeding resulted in a valid final judgment and the issue in
> question was actually and necessarily determined in that prior
> proceeding. The doctrine bars relitigation of issues when the
> parties had a full and fair opportunity to litigate those issues in an
> earlier action. A decision is final when all appeals have been
> exhausted or when the time available for an appeal has passed.

*Johnston v. Sterling Mortg. & Inv. Co.,* 894 N.W.2d 121, 137 (Mich. Ct. App. 2016) (citation

omitted).

The Debtors' Motion, based on alleged violations of the automatic stay, seeks to void the

2009 Settlement Agreement, and the transfer of the Property under the Settlement Agreement by

the Quit Claim Deed, and the recording of the Affidavit of Lost Quit Claim Deed. As a result,

the Debtors in effect are seeking a determination by this Court that they, not RL & DG or the

Hakalas, are the owners of the Property.

But the issue of who owns the Property was actually litigated in the 2012 Eviction Case.

The final judgment in that case concluded that RL & DG was entitled to possession of the

Property. In so doing, that judgment necessarily determined that RL & DG, and not the Debtors,

owned the Property. This is so because RL & DG's express claim that it owned the Property,

31

stated in its complaint and in the June 28, 2012 hearing in the 2012 Eviction Case, was the only basis for RL & DG's claim that it had the right to possession of the Property. In finding that RL & DG was entitled to possession of the Property, therefore, the final judgment implicitly, but clearly and necessarily, determined that RL & DG owned the Property.

"Nothing in the statute or in *JAM Corp.* stands for the proposition that, having litigated in the district court the issue of who has the right to the premises, that question can be relitigated de novo in a subsequent suit." *Sewell v. Clean Cut. Mgmt., Inc.,* 621 N.W.2d at 224.

In the case of *Johnston v. Sterling Mortg.*, the court found that a quiet title action alleging, in part, an improper foreclosure process and unlawful interference with redemption efforts, was barred by a prior summary proceeding, under the doctrines of res judicata and collateral estoppel. 894 N.W.2d at 137. The court noted that the summary proceeding involved the same parties, was decided on the merits, and the issue raised in the quiet title action, the interference with the redemption process, was also raised in the summary proceeding. *Id.* The court rejected the argument that the trial court in the summary proceeding did not have jurisdiction to decide issues of title. *Id.* at 138-140. The court stated that such argument "fails to appreciate that some possession judgments are necessarily predicated on an underlying title determination . . . ." *Id.* at 139, quoting from *Bank of America v. 5-3 Greenway Trust,* Case No. 324043, 2015 WL 9392725 at * 6 (Mich. Ct. App. Dec. 22, 2015).

This Court concludes that, in this case, both res judicata and collateral estoppel preclude relitigation of the question of who owns the Property.

The 2012 Eviction Case and this case involve the same parties. RL & DG, as the plaintiff in the 2012 Eviction Case, had the burden to prove that it had a right to possession of the

Property, based on its claimed ownership of the Property. *Rathnaw v. Hatch*, 275 N.W. 189, 189 (Mich. 1937). RL & DG alleged in its complaint that it was entitled to possession because it owned the Property, based on a quit claim deed executed by the Debtors and evidenced by the Affidavit of Lost Quit Claim Deed. The Debtors disputed RL & DG's ownership claim, and defended by alleging that they were entitled to possession. They also alleged that the quit claim deed was invalid as a product of fraud. The state court's judgment of possession in favor of RL & DG was "necessarily predicated on an underlying title determination," *Johnston v. Sterling Mortg. & Inv. Co.,* 894 N.W.2d at 139, and therefore, the state court actually and necessarily decided the issue of ownership.[89] The state court's October 9, 2012 Eviction Judgment was not

---

[89] Although the 2012 Eviction Judgment states that the matter came before the court for trial on September 24, 2012, the Debtors allege that their attorney withdrew prior to trial and did not provide them notice of the withdrawal as required by a September 14, 2012 District Court order. Debtors state that the lack of notice "caused them to default as to compliance with discovery and future Court appearances." (Docket # 94 at pdf p. 4). The Debtors might have raised this argument on an appeal from the 2012 Eviction Judgment, but they did not appeal.

In addition, the Court notes that the September 14, 2012 District Court order states that Debtor's counsel was to serve Debtors a copy of the "Order for Withdrawal of Counsel" as well as an Order to Compel (Discovery) prior to September 24, 2012 and provide a proof of service to the court. (Order for Withdrawal of Defendants' Counsel Docket # 94 at pdf p. 29). The Court also notes that the District Court "Register of Actions" filed in this case by the Debtors contains a notation for September 21, 2012 indicating a proof of service "re: order to withdraw." (Docket # 103 at pdf p. 7).

This Court has only a partial transcript of the September 24, 2012 trial, and therefore cannot determine if, in fact, the Debtors were defaulted solely for their failure to comply with a discovery order. But it does not make a difference in the analysis of the res judicata and collateral estoppel issues. Under Michigan law, for example, collateral estoppel applies to default judgments. This is true even where the default judgment was a default for failing to participate in the litigation in any manner, *McCallum v. Pixley* (*In re Pixley*), 504 B.R. 852, 860-62 (Bankr.E.D.Mich. 2014) citing *Barnes v. Jeudevine*, 718 N.W.2d 311,315 (Mich. 2006), and it is also true where the default judgment was entered as a sanction against a defendant who has appeared and participated in the litigation, *Kasishke v. Frank* (*In re Frank*), 425 B.R. 435, 439-40 (Bankr.W.D.Mich. 2010) (collecting cases); *Kalamazoo Oil Co. v. Boerman*, 618 N.W.2d 66, 70 (Mich.Ct.App. 2000) (the entry of a default as a sanction for discovery abuses estopped the defendant from litigating issues of liability). Likewise, a default judgment is considered a decision on the merits for purposes of res judicata. *Richards v. Tibaldi*, 726 N.W.2d 770, 776 (Mich. Ct. App. 2006).

appealed, and thus, it became a valid and final judgment.[90]  And there is no question that the

Debtors had a full and fair opportunity to litigate the issue.[91]

———————————————

[90]  Under Mich. Comp. Laws § 600.5753, a party aggrieved by the judgment in a summary proceeding may appeal to the circuit court.

[91]  The Michigan Supreme Court in *Monat v. State Farm Ins Co.,* 677 N.W.2d 843, 845 n 2 (Mich.  2004) stated that, in determining whether a party has had a "full and fair" opportunity to litigate an issue, courts should look to the Restatement (Second) of Judgments.  Section 28 of the Restatement provides:

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue *in a subsequent action between the parties* is not precluded in the following circumstances:
>
> (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
>
> (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or
>
> (3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or
>
> (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or
>
> (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

*Restatement (Second) of Judgments* § 28 (1982) (emphasis added).

**C.  The Debtors also are precluded by the doctrine of laches from alleging a stay violation.**

Laches is an equitable basis for barring a party's claim.  *See Chirco v. Crosswinds Communities, Inc.,* 474 F.3d 227, 231 (6th Cir. 2007).  In order to establish laches as a defense, a party must demonstrate: "'(1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party.'" *EEOC v. Watkins Motor Lines, Inc.,* 463 F.3d 436, 439 (6th Cir. 2006) (citation omitted).

> "[L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced. By his negligent delay, the plaintiff may have misled the defendant or others into acting on the assumption that the plaintiff has abandoned his claim, or that he acquiesces in the situation, or changed circumstances may make it more difficult to defend against the claim."

*Chirco v. Crosswinds Communities,* 474 F.3d at 231 quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2946 at 117 (2d ed. 1995).  The doctrine of laches has been applied to prevent a debtor from claiming a stay violation under circumstances similar to this case.  *See Matthews v. Rosene,* 739 F.2d 249, 251 (7th Cir. 1984) (An almost three year delay in alleging a stay violation was not reasonable, and the creditor would be seriously prejudiced if the state court order was set aside, where the real property at issue had been sold years before).

In this case, the actions that the Debtors allege violated the automatic stay occurred in 2009 (the Settlement Agreement) and 2012 (the filing of the Affidavit of Lost Quit Claim Deed

---

None of these factors is present in this case.  The Debtors had a full and fair opportunity to litigate in the 2012 Eviction Case.

and the Eviction Case).  However, the Debtors did not allege the stay violations until 2019, almost ten years after the first alleged violation, and almost seven years after the other alleged violations.  This clearly is an unreasonable delay.

The Debtor Roger Ottoman's testimony at the § 341 hearing, which was given on behalf of both of the Debtors, demonstrates that as early as December 23, 2009, he had knowledge of the settlement which the Debtors now complain violated the stay.  *See* Part III.B.2 of this Opinion.  And the Debtors have admitted that their attorney, Jan Slotnick, told them that they had until March 1, 2012 to pay RL & DG the amounts due under the Settlement Agreement.  *See* Part III.B.3 of this Opinion.  Furthermore, beginning in May 2010, the Debtors became responsible to make monthly payments totaling $12,500.00 to the Chapter 7 Trustee to account in part for the benefit (26 months possession, rent-free) they received under the Settlement Agreement, and the record shows that the Debtors made such payments.  *See* Part III.B.4 of this Opinion.

And as noted in Part V.A of this Opinion, it is very clear that both of the Debtors and their eviction attorney, Eric Ladasz, knew in detail, at least as early as June 28, 2012, ***all*** of the facts upon which the Debtors now base their claim that RL & DG violated the automatic stay.  And it is clear that no later than June 28, 2012, the Debtors' eviction attorney, Eric Ladasz, actually had a copy of the 2009 Settlement Agreement and the April 4, 2012 Affidavit of Lost Quit Claim Deed and its attachments.  *See* discussion in Part III.C.2 of this Opinion.  And all of attorney Ladasz's knowledge is imputed to the Debtors.  *See* discussion in Part V.A of this Opinion.  Yet the Debtors waited almost seven years, until February 2019 at the earliest, to ever claim that RL & DG had violated the automatic stay in any way.

With respect to the Debtors' allegation that the filing and prosecution of the 2012

36

Eviction Case was itself an automatic stay violation, that case was concluded with a final judgment in October 2012, almost six and one-half years before the Debtors ever alleged any stay violation.

Lastly, the Debtors attached to the Motion a copy of a "Forensic Document Examination Report" prepared for the Debtors and dated August 30, 2016, two and one half years before the Debtors alleged any stay violations in this case.[92] The report opines that the Debtors' signatures on the Quit Claim Deed were cut and paste from another source, and that the Debtors themselves did not sign the Quit Claim Deed.[93]

RL & DG and the Hakalas would be prejudiced if Debtors were now permitted to allege that the Quit Claim Deed resulting from the Settlement Agreement is void because of a stay violation. Many years have passed since the Property was sold to the Hakalas in May 2013.

Both RL & DG and the Hakalas understandably have relied on the validity of the sale.[94] With respect to the Hakalas, the Debtors have not alleged, or presented any evidence, that before they bought the Property in May 2013 the Hakalas had anything to do with, or had any knowledge of, any alleged stay violations by RL & DG, or any alleged forgeries of the Debtors' signatures on the 2009 Settlement Agreement or the Quit Claim Deed.

And the Debtors' challenge to RL & DG's ownership of the Property, at the time RL &

---

[92] 2016 Forensic Document Examination Report (Docket # 65-1 at pdf pp. 35-37)

[93] *Id.*

[94] The Debtors argue that the Hakalas would not prejudiced if this Court rules that the stay was violated, because they can just continue to make their "bona fide purchaser" argument in state court. That this is far from clear, because the Debtors seek an order from this Court that would void the Quit Claim Deed and the 2012 Eviction Judgment that are the bases for RL & DG's ownership of the Property that it sold to the Hakalas. And the Debtors also argue that the Hakalas' "bona fide purchaser" argument would fail under Michigan law, because, Debtors say, the Quit Claim Deed was the product of a forgery.

DG sold it to the Hakalas, which is now based on claims of forgery and automatic stay violations, was conclusively put to rest by the October 9, 2012 final judgment in the 2012 Eviction Case. The Debtors had ample knowledge available to them to raise their claims of forgery and automatic stay violations against RL & DG in defending the 2012 Eviction Case, but they failed to do so before that case went to final judgment. Under the circumstances, when RL & DG sold the Property to the Hakalas in May 2013, it too understandably relied on the Debtors' silence and inaction — *i.e.*, the Debtors' failure to raise, until many years later, their current claims of forgery and automatic stay violations.

Moreover, the Debtors are wrong when they argue that allowing them to proceed with the stay violation claims has no effect on the Court. To permit the Debtors now to void the 2009 Settlement Agreement, the Affidavit of Lost Quit Claim Deed, and the final judgment against the Debtors in the 2012 Eviction Case, "would violate fundamental principles of finality in judicial proceedings." *Camacho v. Homeq Servicing Corp. (In re Camacho)*, 311 B.R. 186, 195 (Bankr.E.D.Mich. 2004).

The Debtors argue that RL & DG cannot benefit from the equitable doctrine of laches, because it has "unclean hands." The "[unclean hands] doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief....'" *Doss v. Green (In re Green)*, 986 F.2d 145,150 (6th Cir. 1993) (citation omitted).

> The concept of unclean hands may be employed by a court to deny [relief] where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party. The doctrine of unclean hands requires that the alleged misconduct on the part of the [party seeking relief] relate directly to the transaction about which the [party seeking relief] has made a complaint. Thus, the

38

> doctrine is to be applied only where some unconscionable act of
> one coming for relief has immediate and necessary relation to the
> equity that he seeks . . . . The unclean hands doctrine can be
> applied only to conduct relating to the matter in litigation.  Finally,
> the doctrine is not to be used as a loose cannon, depriving a [party
> seeking relief] of an equitable remedy to which he is otherwise
> entitled merely because he is guilty of unrelated misconduct.

*Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1383 (6th Cir. 1995)

(internal citations and quotation marks omitted).  *See also In re Mabone*, 471 B.R. 534, 538-39

(Bankr. E.D. Mich. 2012).

The Debtors argue that RL & DG did not seek permission of this Court to lift the stay in

this case, but instead chose to violate the stay because "to have sought [the] Court's permission

to lift the [a]utomatic [s]tay would alert the Debtors to the false Quit Claim [D]eed and Affidavit.

[RL & DG] did not want the Debtors or the Court to uncover the fraud they were perpetrating.

The fraud which is now uncovered . . . by an expert handwriting analysis obtained by the

Debtors."[95]

The Debtors have filed a copy of a "Forensic Document Examination Report" dated

August 20, 2016, which opines that the signatures on the July 1, 2010 Quit Claim Deed were "cut

and paste" signatures from another document and that the Quit Claim Deed was not physically

signed by the Debtors.[96]  The Debtors have also filed a "Forensic Document Examination

Report" dated July 29, 2019 which opines that the Debtors did not sign the Settlement

Agreement, but rather their signatures were copied from another source.[97]

---

[95]  Responsive Brief in Support of Motion to Void and Nullify (Docket # 81 at pdf p 6).

[96]  2016 Forensic Document Examination Report (Docket # 65-1 at pdf pp 35-37).

[97]  2019 Forensic Document Examination Report (Docket # 94 at pdf pp 14-15).

39

The "unclean hands" doctrine does not prevent the application of the doctrine of laches in this case. First, the Debtors do not allege any action taken by RL & DG or the Hakalas which prevented the Debtors from seeking relief for the alleged stay violations (which occurred in 2009 and 2012) long before August 2016, when the Debtors received the forensic report opining that the signatures on the quit claim deed were "cut and paste" from another source. As discussed above, both of the Debtors and their eviction case attorney, Eric Ladasz, knew all about the 2009 Settlement Agreement and the 2012 Affidavit of Lost Quit Claim Deed, no later than June 28, 2012. Certainly the Debtors would have and should have known, no later than that date, if in fact their signatures had been placed on these documents by someone else, without their authorization.

Second, neither of the forensic reports relied on by the Debtors support the conclusion that RL & DG was responsible for the alleged "cut and paste" signatures. Others may be responsible for the alleged "cut and paste" signatures, such as Jan Slotnick, the attorney that represented the Debtors according to Roger Ottoman's § 341 testimony. Indeed, in the 2018 state court lawsuit described in Part III.C.4 of this Opinion, the Debtors filed a brief on February 27, 2019 in which they allege that after they filed this bankruptcy case, "JAN SLOTNICK and RLDG's counsel, Andrew Harris and Alan Taylor proceeded to push JAN SLOTNICK to have ROGER and MARCIA OTTOMAN, sign the settlement agreement for the Circuit Court Case as well as a deed all of which were prepared by them."[98]

For these reasons, the Court concludes that the Debtors have not established that RL &

---

[98] Debtors' [brief], filed on February 27, 2019 in the 2018 Circuit Court lawsuit, copy attached as part of Exhibit A to the Hakalas' Supplemental Brief (Docket # 92-1) at pdf p. 3.

DG has "unclean hands."

And the Debtors have not made any "unclean hands" argument at all with regard to the

Hakalas, who also argue laches.

**D. In this case, in any event, any actions taken in violation of the automatic stay are not void.**

As the parties have noted, in *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905 (6th Cir.

1993), the Sixth Circuit held that "actions taken in violation of the stay are invalid and voidable

and shall be voided absent limited equitable circumstances." 990 F.2d at 911. The court

described such "equitable circumstances" this way:

> only where the debtor unreasonably withholds notice of the stay
> and the creditor would be prejudiced if the debtor is able to raise
> the stay as a defense, *or where the debtor is attempting to use the*
> *stay unfairly as a shield to avoid an unfavorable result*, will the
> protections of section 362(a) be unavailable to the debtor.

*Id.* (emphasis added).

In *Easley*, the debtor, who was a defendant in a federal district court action, moved to

dismiss the action because it was filed in violation of the automatic stay. The court concluded

that the debtor "did not behave unreasonably and the equitable exception should not apply." *Id.*

at 911. In reaching this conclusion, the court noted that:

> As previously pointed out, as soon as defendant was made aware of
> plaintiffs' lawsuit, it notified plaintiffs that their action was in
> violation of the automatic stay. Defendant did nothing to lull
> plaintiffs into believing it would not rely on the stay. . . .

*Id.* at 911-12.

The facts of this case are quite different from those in *Easley*. Here, as discussed above,

the Debtors did not raise the issue of the alleged stay violation(s) until many years had passed,

and despite having had the opportunity to do so both in this bankruptcy case and in the 2012 Eviction Case.

A case that is similar to this case is *Camacho v. Homeq Servicing Corp.* (*In re Camacho*), 311 B.R. 186 (Bankr. E.D. Mich. 2004). There, the defendant, a lender under a second mortgage, filed an affidavit of lost deed, entitled "Affidavit of Lost Deed of Trust/Mortgage," during the pendency of the debtors' Chapter 13 bankruptcy case. The Chapter 13 case was later dismissed because of the debtors' failure to make plan payments. Three years after the affidavit of lost deed was filed, the debtors filed a second bankruptcy case, under Chapter 7, and listed the defendant as the holder of an unsecured claim. *Id.* at 188. The debtors took no action in the second bankruptcy case to address the alleged stay violation, and received a discharge. *Id.* at 189. When the debtors later defaulted on their first mortgage and a foreclosure sale was scheduled, they filed another Chapter 13 case. This time the defendant was not listed as a creditor. *Id.* at 189. The defendant filed a proof of claim. The debtors then argued that the mortgage was not recorded, and that the affidavit of lost deed was void because it was filed during the time the automatic stay was in effect, during the debtors' first bankruptcy case. *Id.* The debtors filed a complaint to determine the validity of the Defendant's lien.

The bankruptcy court found that the filing of the affidavit of lost deed was a violation of the automatic stay under 11 U.S.C. § 362(a)(5). *Id.* at 192. The court then considered whether under *Easley v. Pettibone*, the filing of the affidavit should be deemed void. It determined that there were "numerous equitable circumstances that militate in favor of the Defendant and against the Debtors." *Camacho v. Homeq Services Corp.,* 311 B.R. at 192-193. The court in *Camacho* concluded that the debtor could not challenge the action taken in violation of the stay:

42

The Debtors' request to void the filing of the Affidavit in violation of § 362(a) would have been more compelling in the first bankruptcy case, and perhaps even in the second bankruptcy case. As of the moment in time when this third bankruptcy case was filed on October 14, 2003, three years had passed since the Affidavit was filed, the first case in which the alleged stay violation took place had been dismissed, and the second case had been filed and proceeded to closing with an allowed secured claim in favor of the Defendant. To permit the Debtors to now void the filing of the Affidavit would violate fundamental principles of finality in judicial proceedings. At some point, the Debtors' ability to challenge the filing of the Affidavit for violating the stay in another bankruptcy case must come to a close.
. . .

While the Court recognizes that *Easley* carefully limits the circumstances in which actions taken in violation of the stay are not voided, the Court considers this to be the case that proves the exception to the rule. . . .

*Id.* at 195.

In this case, equitable circumstances lead this Court to find that the actions allegedly taken in violation of the stay are ***not*** void. First, far too much time has passed between the alleged stay violations and the filing of the present Motion (6.5 to 9.5 years). And this is not simply a matter between the Debtors and RL & DG. The interests of innocent third parties, the Hakalas, are involved, and would be adversely affected by a ruling voiding the Settlement Agreement, the Affidavit of Lost Quit Claim Deed, the Quit Claim Deed, or the 2012 Eviction Judgment.

The Debtors argue that the Hakalas would not be prejudiced because they could seek damages from RL & DG. But that argument is not persuasive, because further litigation to seek such damages would certainly be a financial burden on the Hakalas, and because damages would not be an adequate substitute for a loss by the Hakalas of their ownership of the Property. The

43

Court finds that the Debtors are now "attempting to use the stay unfairly as a shield to avoid an unfavorable result" in both the 2012 Eviction Case and in the pending Circuit Court action. This case presents one of the types of "equitable circumstances" described in *Easley*.[99] Finally, as the court noted in *Camacho,* at some point the ability to claim a stay violation must come to an end. This case is many years beyond that point.

**E. There has been no violation of the discharge injunction.**

An order granting the Debtors a discharge was entered in this case on February 23, 2010.[100] The Debtors argue that the 2009 Settlement Agreement "was ineffective to bind them after receiving their discharge,"[101] and that "RL & DG's current assertions of the validity of the Settlement Agreement and Release are in violation of" the discharge injunction under 11 U.S.C. § 524(a)(2).[102] The Debtors are not correct.

First, the Debtors' discharge only applies to debts "that arose before the order for relief," meaning in this case before the bankruptcy petition date of November 18, 2009. *See* 11 U.S.C. §§ 727(b); 301(b). The December 18, 2009 Settlement Agreement did not create any "debt" on the part of the Debtors that "arose" before November 18, 2009.

Second, the discharge injunction under § 524(a)(2) enjoins only actions to collect a discharged debt "as a personal liability of the debtor." Section 524(a)(2) states:

---

[99] Furthermore, regarding the allegation that the Settlement Agreement should be voided because it was made after the bankruptcy case was filed, as discussed in Part III.B.1 of this Opinion, it appears from the record that at the time of the Settlement Agreement (December 18, 2009), RL & DG had not yet been given notice of the bankruptcy case.

[100] Order Granting Discharge (Docket # 32).

[101] *See* proposed order attached to the Debtors' Motion at p. 2 (Docket # 65 at pdf p. 8).

[102] Motion (Docket # 65) at pdf p. 4 ¶ 13.

44

> A discharge in a case under this title—
>
> operates as an injunction against the commencement or
> continuation of an action, the employment of process, or an act, to
> collect, recover or offset any such debt **as a personal liability of
> the debtor**, whether or not discharge of such debt is waived . . . .

11 U.S.C. § 524(a)(2).  "[T]he discharge injunction prohibits efforts to collect discharged, pre-

petition debts only 'as a personal liability of the debtor.'"  *In re Kalabat*, 592 B.R. 134, 143

(Bankr. E.D. Mich. 2018).  It does not prohibit actions taken by a creditor to enforce a lien or to

enforce its ownership rights in property.  *See id.*  As this Court held in *Kalabat*,

> If a creditor had a lien to secure payment of a pre-petition debt
> before the Chapter 7 bankruptcy, that lien survives, or "rides
> through" the Chapter 7 bankruptcy and bankruptcy discharge,
> unless the lien is avoided in the bankruptcy case.  And a creditor
> with such a lien may seek to enforce its lien rights and collect on
> its secured claim, sometimes called its "*in rem* claim," after
> discharge, even if the debtor's personal liability for the creditor's
> debt was discharged.

*Id.*; *see also In re Johnson*, 439 B.R. 416, 428 (Bankr. E.D. Mich. 2010), *aff'd. on other

grounds*, 2011 WL 1983339 (E.D. Mich. 2011).

In this case the Debtors do not and cannot dispute that when RL & DG entered into the

2009 Settlement Agreement with the Debtors, RL & DG had an "equitable mortgage" (*i.e.*, a

lien) in the Property, based on the state court's Decision in the 2007 Eviction Case.  *See

discussion in Part III.A.2 of this Opinion.  The Settlement Agreement itself, and the actions taken

by RL & DG to enforce the Settlement Agreement that the Debtors complain of (recording the

Affidavit of Lost Quit Claim Deed on April 4, 2012; filing and prosecuting the 2012 Eviction

Case to final judgment), were ***not*** efforts to colllect any pre-petition debt from the Debtors "as a

personal liability of" the Debtors.  Rather, all such actions simply were "*in rem*" actions by RL &

DG, to enforce its lien rights in the Property under the Settlement Agreement. Those rights to the Property survived the Debtors' discharge.

Thus, RL & DG has not violated the discharge injunction. In addition, the Debtors' discharge-related claims now alleged against RL & DG and the Property are barred in any event, for the same reasons the Debtors' automatic stay violation claims are barred. *See* Parts V.A through V.D of this Opinion.

## VI. Conclusion

For the reasons stated above, the Court concludes that the Debtors' Motion must be denied. The Court will enter an order denying the Motion.

**Signed on October 16, 2020**



/s/ **Thomas J. Tucker**
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**